## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| MAPAY, LLC, | |
|       Plaintiff, | |
|       v. | Case No. 1:24-cv-08614 |
| ROBERT METZ, ARMOUR OPS, LLC D/B/A ARMOUR LIFE SCIENCES, LLC, KATHRYN MERTES-EGELAND, BRANDOMINANCE, INC., NATALIE ALLMAN DUMSTORFF, NATALIE ALLMAN, INC., and MICHAEL SULLIVAN, | **JURY TRIAL DEMANDED** |
|       Defendants. | |

## COMPLAINT

Plaintiff, MAPay, LLC, ("MAPay"), by its attorneys, Pedersen & Houpt, P.C., for its Complaint against Defendants Robert Metz ("Metz"), Armour Ops, LLC d/b/a Armour Life Sciences, LLC ("Armour"), Kathryn Mertes-Egeland ("Mertes-Egeland"), BRANDominance, Inc. ("BRANDominance"), Natalie Allman Dumstorff ("Allman Dumstorff"), Natalie Allman, Inc. ("Allman Inc."), and Michael Sullivan ("Sullivan") (collectively, "Defendants"), states as follows:

## INTRODUCTION

1.     MAPay brings this action against Defendants Metz, Mertes-Egeland, Allman Dumstorff, and Sullivan (collectively, the "Individual Defendants"), as individuals, each of whom performed work for and on behalf of MAPay under the direction of Metz. Metz and Mertes-Egeland are also investors in MAPay.

2.     MAPay brings this action against Defendants Armour, BRANDominance, and Allman Inc., (collectively, the "Corporate Defendants"), as signatories to certain nondisclosure agreements ("NDAs") relating to trade secrets and proprietary information owned by MAPay.

1

Metz signed an NDA on behalf of his company, Armour, on December 16, 2022. Mertes-Egeland signed an NDA on behalf of her company, BRANDominance, on January 29, 2023. Allman Dumstorff signed an NDA on behalf of her company, Allman Inc., on February 14, 2023. Sullivan signed an NDA on his own behalf and as a consultant of MAPay on January 27, 2023. Copies of these signed NDAs are attached hereto as **Group Exhibit A.**

3.     The NDAs contain clear and express restrictive covenants to protect and refrain from disclosing or using any of MAPay's "Confidential Information," defined as MAPay's "proprietary or confidential information, technical data, trade secrets or know-how,  including but not limited to research, product plans, products, service plans, services, customer lists and customers, markets, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, marketing, distribution and sales methods and systems, sales and profit figures, finances and other business information." (**Group Ex. A § 1**). The NDAs also state that no license under any patent, trademark, copyright, trade secret or other proprietary or intellectual property right of MAPay was granted or implied by the disclosure of any Confidential Information by MAPay to any Defendant. (**Group Ex. A § 8.**)

4.     In connection with monetary investments made and work performed by the Defendants for MAPay, MAPay disclosed extensive Confidential Information to Defendants subject to the protections provided under the NDAs. MAPay disclosed extensive information concerning its proprietary application that brings a new and innovative drug pricing model to the healthcare sector using a blockchain platform. MAPay disclosed to the Defendants all the details of its inventions, pricing models, and blockchain technology that forms the basis of its confidential and proprietary invention (the "MAPay Platform."). MAPay also provided to Defendants its confidential customer lists and information about its markets, distribution, and sales methods.

5.      After working with MAPay for months following the signing of the NDAs and obtaining access to MAPay's Confidential Information subject to the protections provided under the NDAs, Defendants violated the NDAs and misappropriated MAPay's Confidential Information for their own use. Defendants notified MAPay that they had filed a Provisional Patent with the United Stated Patent and Trademark Office ("USPTO"), were independently marketing a competing technology to MAPay's customers, and were offering competing services and value based pricing technology that is almost entirely based on the MAPay Platform and the Confidential Information Defendants accessed pursuant to the NDAs during their work with MAPay.

6.      When MAPay learned that the Defendants had breached the NDAs and misappropriated MAPay's Confidential Information for their own use, MAPay demanded that Defendants cease disclosing or using the MAPay Platform and its Confidential Information. Defendant Metz responded by asserting baseless claims about ownership of the MAPay Platform and by revealing the filing of the Provisional Patent under Metz's name. Threatening further breaches of the NDAs, Metz also demanded a refund of his investment in MAPay, to which he is not entitled, and consulting fees under a consulting agreement he never signed.

7.      Metz also posted on various social media websites, making untrue statements and accusations about MAPay and its officers. These statements were false, harassing, and harmed MAPay's reputation and business relationships within the healthcare industry and with its current and potential investors.

8.      Metz also used his social media accounts to advertise and promote a competing value based pricing technology, which is nearly identical to MAPay's Platform. Metz only learned about value based pricing and blockchain technology through his work with MAPay. Metz's

promotional statements on social media attribute all ownership and development of Armour's value based pricing services to himself and his company, Defendant Armour.

9. By violating the NDAs, misappropriating MAPay's Confidential Information for their own use, and presenting competing technology that is virtually identical to MAPay's proprietary MAPay Platform, Defendants acted intentionally, without authorization or justification, and violated MAPay's rights.

10. Defendants have conspired and engaged in a coordinated effort to misappropriate MAPay's Confidential Information and to solicit and divert MAPay's customers. Defendants have threatened further breaches of the NDAs and further disclosure of the MAPay Platform unless MAPay agrees to make payments to Defendants to which they are not entitled.

11. MAPay brings this action to recover the damages it has suffered resulting from Defendants' conduct, to prevent Defendants from further violating the NDAs and confusing or misleading MAPay's customers, and further misusing or disclosing MAPay's Confidential Information.

**PARTIES**

12. Plaintiff MAPay, LLC is a Delaware limited liability company with its principal place of business at 1202 Laurel Oak Road, Suite 208, Voorhees, NJ 08043. Through its members, MAPay is a citizen of New Jersey, Florida, Connecticut, Minnesota, California, Maryland, Utah, and Pennsylvania.

13. Defendant Robert W. Metz, an individual, is a citizen of Florida and resides at 550 Chipping Lane, Longboat Key, Florida 34228.

14. Defendant Armour Ops, LLC d/b/a Armour Life Sciences, LLC, is a Delaware limited liability company with its principal place of business at 112 Oak Terrace, Lake Bluff, Illinois 60044, and is a citizen of Illinois and Florida.

15. Defendant Kathryn Mertes-Egeland, an individual, is a citizen of Florida and resides in Ponte Vedra Beach, Florida.

16. Defendant BRANDominance, LLC is an Illinois limited liability company with its principal place of business at 524 Provident Avenue, Winnetka, Illinois 60093, and is a citizen of Florida and Illinois.

17. Defendant Natalie Allman Dumstorff, an individual, is a citizen of Illinois and resides at 1829 West Lunt Avenue, Chicago, Illinois 60626.

18. Defendant Natalie Allman, Inc. is an Illinois corporation with its principal place of business at 1829 West Lunt Avenue, Chicago, Illinois 60626.

19. Defendant Michael Sullivan, an individual, is a citizen of Florida and resides at 777 97th Avenue North, Naples, Florida 34108.

## JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1367 because Plaintiff asserts claims arising under federal law, and Plaintiff's remaining state law claims are so related to Plaintiff's federal claim that they form part of the same case or controversy.

21. This Court has personal jurisdiction over the Defendants because they have had regular and systematic contacts with the State of Illinois and have purposefully availed themselves of the benefits and protections of the laws of Illinois in at least the following ways: (a) all Corporate Defendants have principal places of business in Illinois, (b) Defendant Allman Dumstorff is a resident and citizen of Illinois, and Defendants Metz and Mertes-Egeland lived in Illinois for the

majority of the events giving rise to Plaintiff's claims and continue to own property and operate their businesses out of Illinois, and (c) Defendants Sullivan, Metz, Allman Dumstorff, and Mertes-Egeland voluntarily submitted to the jurisdiction of Illinois courts in the filing of a lawsuit and previously argued for the transfer of an earlier-filed complaint by MAPay against Defendants from the District of New Jersey to the Northern District of Illinois. *See MAPay, LLC. v. Metz, et al.*, No. 23-cv-21678, Dkt. No. 31 (D.N.J.); *see also Metz v. MAPay, LLC, et al.*, No. 2023CH10036 (Cir. Ct. Ck. Cty).

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTS RELEVANT TO ALL COUNTS

### A.     MAPay and the MAPay Platform

23.     Founded in 2018, MAPay is a global healthcare fintech company that is deploying distributed ledger technology, or blockchain, to power smart contracts, transacting secure medical solutions through the MAPay Value Based Pricing Platform. MAPay has developed and invented a hybrid architecture of both centralized and decentralized protocols for multi-party medical payments and HIPAA-compliant data exchange. MAPay works in association with hospital networks, practice management systems, drug companies, insurance payers, pharmacies, and government entities in the United States, Bermuda, and India. The MAPay Platform empowers patients and healthcare providers by leveraging blockchain technology to improve and align incentives, reduce costs, and bring increased transparency and data exchange. Its website is: https://www.mapaycorp.com/.

24.     In marketing and deploying the MAPay Platform, MAPay has negotiated and formed working relationships with healthcare providers and companies throughout the United

States, including an American multinational pharmaceutical company headquartered in New York, and it has entered into contracts with government entities in both Bermuda and India.

25. MAPay protects the confidentiality of the MAPay Platform by requiring the recipients of information relating to the platform and MAPay's customer relations to sign nondisclosure agreements and by maintaining the MAPay Platform and MAPay's underlying technology, formulas, pricing models, and other related and proprietary inventions on a password-protected system accessible only by those authorized by MAPay.

**B.      MAPay Begins Work with Metz**

26. In early December 2022, Defendant Metz was introduced to MAPay's founder and Chief Executive Officer, Michael Dershem ("Dershem"), through a mutual contact in the healthcare industry. Upon learning more about MAPay, Metz was attracted to the company as both an investment and employment opportunity because of the breadth of opportunities its innovative, unique, and patent-protected MAPay Platform presented for the healthcare market.

27. On December 16, 2022, Metz signed an NDA with MAPay as the Managing Director of his company, Defendant Armour.

28. The NDA requires that any party that receives Confidential Information must maintain the confidentiality of the information:

Dear Robert Metz:

In connection with our consideration of a possible business transaction, each of MAPay, LLC, a Delaware limited liability company (including its affiliates and their respective successors, transferees and permitted assigns, "MAPay"), and Robert W. Metz Armour ("COMPANY") may disclose certain of its proprietary and confidential information concerning its business and affairs to the other party. As a condition to the furnishing by one party (in such capacity, the "Disclosing Party") of such information as the Disclosing Party, in its sole and absolute discretion, may determine to furnish to the other party (in such capacity, the "Recipient"), the parties hereto agree to comply with the terms and conditions set forth below:

    1.   <u>Confidential Information</u>.  The Recipient shall take reasonable steps to ensure that all "Confidential Information" (defined below) of the Disclosing Party is kept confidential; provided, however, that such information may be disclosed to those representatives, counsel, directors, officers, employees and agents (each, a "Representative," and collectively, the "Representatives") of the Recipient who have a need to know such information in connection with a proposed business transaction (collectively, the "Stated Purpose"), only if each such Representative is informed by the Recipient of the confidential nature of such information and of the confidentiality undertakings of the Recipient contained herein. The Recipient shall be responsible for any breach of this Agreement by its Representatives.

    As used herein, "reasonable steps" means the steps that the Recipient takes to protect its own, similar confidential and proprietary information, which shall not be less than a reasonable standard of care.

**(Group Ex. A § 1.)**

29.    The NDA defines "Confidential Information" as MAPay's "proprietary or confidential information, technical data, trade secrets or know-how, including but not limited to research, product plans, products, service plans, services, customer lists and customers, markets, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, marketing, distribution and sales methods and systems, sales and profit figures, finances and other business information disclosed to the Recipient by or on behalf of the Disclosing Party, either directly or indirectly, in writing, orally or by drawings or inspection of documents or other tangible property." (**Group Ex. A § 1.**)

30.    A few days after signing the NDA, Metz made a financial investment in MAPay and signed a Note Purchase Agreement and an Unsecured Convertible Promissory Note (attached hereto as **Group Exhibit B**).

31.     After negotiating with Dershem and the other officers of MAPay, the parties agreed that Metz would assume the role of MAPay's Chief Global Strategy Officer and would lead MAPay's expansion, sales organization, research and development, client satisfaction, and related activities.

32.     Metz did not have any knowledge of blockchain and/or value-based pricing before he became involved with MAPay.

33.     Metz did not own or bring to MAPay any intellectual property, such as patents, trademarks, copyrights, trade secrets, or any other proprietary business information he had independently developed.

34.     In early March 2023, Metz and MAPay agreed that Metz would receive a monthly consulting fee, but agreed payment would not start immediately and instead would only begin upon receipt of adequate capital funding or customer revenue events.

35.     MAPay expected a large customer revenue event to occur in May 2023, but while the customer contract was still expected, the timing of the cash collection would be deferred. The parties agreed that Metz would start with a $20,000 per month base consulting fee along with a potential equity award.

36.     Upon acceptance of Metz's proposal to consult and work with MAPay, MAPay presented drafts of consulting agreements and equity grant agreements reflecting the economic and other material items agreed to in principle with Dershem and MAPay. Metz never signed the proposed agreements.

37.     Metz began working for MAPay on March 1, 2023 and received a company laptop and email address, and full access to the company's password-protected and confidential information system. This gave Metz complete and unfettered access to MAPay's Confidential

Information including its business plans, pricing, communications, strategies, financial models, agreements with customers, and potential customer lists – all of which relate to the MAPay Platform.

38.    On March 22, 2023, MAPay issued and distributed a press release announcing that Metz had been appointed MAPay's Chief Global Strategy Officer (attached hereto as **Exhibit C**).

39.    Shortly after beginning with MAPay, Metz developed and began using a signature block on emails he sent from his MAPay email address in which he described himself as MAPay's "Global Corporate Strategy Lead," and included a link to MAPay's corporate website:

My very best,

Rob


MAPay, LLC
Global Corporate Strategy Lead
rmetz@mapay.com
Tel: 773-230-6800
www.mapaycorp.com



---

***Metz's Email Signature Block in June 2023***

40.    At about the same time, Metz updated his LinkedIn profile to identify himself as MAPay's "Chief Global Strategy Officer," and began soliciting business:



**Robert Metz** · 1st
Chief Global Strategy Officer at
MAPay, LLC.
41m · Edited · 🌐

In a pharmaceutical/biotechnology world that continues to change with new, expensive small and large molecules, an ever changing regulatory environment and technology upgrades happening at warp speed its hard to fully understand external challenges or align internal solutions. With the recent rollout of the Inflation Reduction Act (IRA) therapeutic manufacturers have to begin down the pathway of Value Based Pricing Models. While this might be new and daunting for some, many have been orienting optimal and reasonable solutions for months or years. We have a patented process to identify, house, report and develop financial models to address the IRA. We focus on how stakeholders with diametrically opposed perspectives can address their needs, and reward their willingness to collaborate with all stakeholders. Contact me directly and lets discuss your challenges and how you have alternatives with a compliant patent protected solution to meet regulatory needs of today.

#ira #valuebasedpricing #marketaccess #reimbursement #regulatory

*Metz's LinkedIn Post and Self-Description, 2023*

### C. Metz Recruits His Own "Commercial Team" and Discloses MAPay's Confidential Information

41.     During March and April 2023, shortly after beginning with MAPay and gaining access to its Confidential Information, Metz recruited his own team, known as the "Commercial Team," to work with MAPay. Metz recruited this team without express approval from MAPay or its leadership.

42.     In recruiting individuals to work with him on MAPay matters, Metz made promises to the individuals he recruited, without authorization from MAPay or its leadership, about compensation and guaranteed equity outcomes. The team Metz assembled had experience in the pharmaceutical industry and included Individual Defendants Mertes-Egeland, Allman Dumstorff, and Sullivan.

43.     As part of his recruitment of the other Individual Defendants, Metz shared with each of them MAPay's Confidential Information without authorization from MAPay.

44.     Mertes-Egeland had made a financial investment in MAPay and signed a Note Purchase Agreement and a Promissory Note in February 2023 (attached hereto as **Group Exhibit D**). In and around this same time, Metz recruited Mertes-England as part of the Commercial Team.

45.     Metz held weekly virtual meetings each Friday with the "Commercial Team," including Mertes-Egeland, Allman Dumstorff, and Sullivan. Initially, no other employees of MAPay were permitted to attend these weekly meetings.

46.     When Dershem learned of Metz's unauthorized recruitment activities and disclosure of MAPay's Confidential Information in April 2023, Dershem promptly addressed the situation to ensure the protection of MAPay's Confidential Information.

47.     MAPay first offered consulting arrangements to the other Individual Defendants, who were recruited by Metz, because of their experience in the pharmaceutical industry and their potential to help grow MAPay. These consulting arrangements, and any related compensation, were conditioned capital funding or customer revenue events similar to Metz. In addition, MAPay granted the other Individual Defendants crypto tokens in exchange for the experience and value they brought to MAPay.

48.     As it had with Metz, MAPay sent drafts of proposed consulting agreements to the other Individual Defendants at various times during their consulting arrangements with MAPay. These proposed consulting agreements were negotiated and revised, but none of the other Individual Defendants ever signed a consulting agreement with MAPay.

49.     Neither Metz, his legal counsel, nor any other Individual Defendant ever proposed any edits or provided any comments regarding the intellectual property ownership provisions of the proposed consulting agreements.

50. At the time they were offered these consulting arrangements, each of the Individual Defendants Metz recruited signed an NDA, either individually or on behalf of their companies.

51. Through investments by members of the Commercial Team, consulting arrangements, and interactions with Metz, Mertes-Egeland, Allman Dumstorff, and Sullivan received and gained access to MAPay's Confidential Information as defined in the NDAs including its proprietary blockchain technology underlying the MAPay Platform and MAPay's business plans, pricing, communications, strategies, financial models, agreements with customers, and potential customer lists.

52. Based on events and information MAPay has learned since August 2023, it is now clear that Metz and the "Commercial Team" undertook concerted efforts to be involved in the ongoing operations of MAPay and to continue to receive the disclosure of MAPay's Confidential Information to enable them to misappropriate and take for their own use MAPay's Confidential Information and the MAPay Platform.

**D. Metz Attends Meetings on Behalf of MAPay with MAPay's Customers**

53. As Chief Global Strategy Officer, Metz participated in many organized events with MAPay, including a number of scheduled weekly calls with MAPay leadership and various members of the MAPay team, as well as many unscheduled daily calls with Dershem.

54. In June 2023, in their official capacities as officers of MAPay, Metz and Dershem traveled to Bermuda for business meetings and wrote a detailed summary of the meetings and work sessions.

55. Metz attended and participated in video conferences with prospective MAPay clients, including an American multinational headquartered in New York. Metz worked on MAPay's relationship and potential transaction with this pharmaceutical and biotechnology corporation in which it would use the MAPay Platform and the value-based pricing model.

56. Metz directly participated in the rollout of the first commercial application of the MAPay Platform in Bermuda.

57. Through these activities and the work he performed on MAPay's project plans, policies, and other content, Metz gained intimate knowledge of the MAPay Platform and had unfettered access to MAPay's business strategies and marketing materials.

**E.      MAPay Begins to Learn Metz's and the "Commercial Team's" True Purpose**

58. After months of discussing draft consulting agreements and equity grant agreements with Metz and the other Individual Defendants, the agreements remained unsigned. MAPay believes these draft agreements were never finalized and executed because, at some point around the beginning of June 2023, Metz decided to delay and prolong the contract negotiation process to create an opportunity to obtain more Confidential Information related to the MAPay Platform so he and the other Defendants could misappropriate it for their own interests.

59. Further confirming these suspicions, MAPay discovered in its review of company emails authored by Metz that he disregarded the intellectual property rights of others and has an appetite to appropriate them for himself. For example, Metz instructed the other Individual Defendants on his Commercial Team that "plagiarism is cool" and made other similar statements.

60. Based on the information MAPay learned directly from communications with Metz, MAPay has confirmed that Metz and the other Defendants copied and misappropriated the MAPay Platform and other Confidential Information that was disclosed to them pursuant to and subject to the protections provided under the NDAs, including the formulas, models, and blockchain technology that form the basis of the MAPay Platform and its business strategies and marketing materials that discuss details of the MAPay Platform and its implementation.

61. In August 2023, MAPay realized that Defendants' true intentions were to misappropriate and steal the MAPay Platform and MAPay's other Confidential Information when

Metz made certain statements in a series of emails to Dershem and MAPay's Chief Managing Officer/General Counsel, John Parker ("Parker"). Since then, Metz has disclosed and made unfounded claims about various aspects or parts of the MAPay Platform, marketed directly to MAPay's customers, including pharmaceutical and biotechnology corporations, and otherwise misappropriated and stolen the MAPay Platform for himself and the other Defendants.

**F.    Metz Reveals His Provisional Patent Application Based on MAPay's Technology and His Intent to Solicit MAPay's Customers**

62.     In an August 11, 2023 email (attached hereto as **Exhibit E**), in response to a draft consulting agreement Parker sent to him, Metz proposed doubling his monthly fee from $20,000 to $40,000, asserted for the first time that he owned inventions he created while working for MAPay, and proposed numerous other new terms and conditions that were unacceptable to MAPay and out of line with the prior drafts of agreements and the parties' discussions to that point.[1]

63.     At about this same time, Metz disclosed to MAPay for the first time that he had submitted a Provisional Patent filing with the USPTO. Metz did not identify or provide a full copy of the Provisional Patent filing, but he advised MAPay that the filing was based around the MAPay Platform and its value-based pricing model.

64.     On August 16, 2023, Dershem sent an email to Metz (attached hereto as **Exhibit F**) in which he responded to Metz's surprising and unexpected August 11, 2023 email. In his email, Dershem addressed the core issue revealed in the emails from Metz concerning the misappropriation of MAPay's Platform and its Confidential Information:

> Let's start with the patent filing that you have advised us has been made. Without seeing the actual filing, we are left to guess as to the content. However, we are very concerned about this application filing for a number of reasons including:

---

[1] Metz's comments are in red in the body of the email sent from Dershem earlier the same day.

• MAPay has IP, inclusive of patent filings made prior to your engagement with the company. Statements made about our IP, including on social media, without the prior review of IP counsel is reckless.

• The commercial dialogue between a pharmaceutical and biotechnology corporation and MAPay on the outlines of a value-based pricing application dates back more than 2 years. This is an MAPay opportunity.

• There are trade secrets, knowhow and confidential information that has been disclosed to you since your engagement with MAPay and execution of an NDA with MAPay. Any of that property that is incorporated into your patent filing remains the property of MAPay. Was any of that disclosed in the patent filing? If so, there are serious issues around misappropriation and co-authorship that must be rectified.

• The impact of your filing on MAPay's IP, while not specifically known until disclosure is made, can be problematic, both domestically and internationally.

When you were retained by MAPay and invited to participate in the further development of the company you were retained under the same framework as every other employee and consultant to the company. You were not retained to in-license IP that you previously developed, and you were not retained to create IP in the course of your engagement to be owned by you. All personnel are expected to contribute to the development of the business, and to the extent new trade secrets or patentable IP are created in the process, that property is company property and not the individual. No company could possibly commercialize applications if inventorship was parsed between every contributor.

65. Despite MAPay's request for clarification about what had transpired, Metz doubled down on his plan to misappropriate the MAPay Platform and steal its customers.

66. Later the same day, Metz sent Dershem and Parker an email (attached hereto as **Exhibit G**), copying Metz's Illinois legal counsel, John Albee, in which he threatened that if MAPay:

utilizes any of his invention (ie: any element of the framework expressed to [key customer] in the teaser deck sent to [key customer] on Thursday, 7/20/23 – then issued to [key customer] on 7/24/23) you will directly infringe on my submitted patent outlining Value Based Pricing in the Pharmaceutical Biotechnology space. I will pursue all necessary avenues to protect my interests.

[The key customer] will be informed of this development.

16

67.     On August 17, 2023, Dershem responded to Metz (attached hereto as **Exhibit H**), and warned Metz that if any part of his Provisional Patent application involved any aspect of MAPay's proprietary Platform, Metz had misappropriated trade secrets and inventions that rightfully belonged to MAPay. (**Exhibit H, p. 2.**)

68.     Dershem reminded Metz that the only reason he knew about value based pricing technology in the healthcare industry was because MAPay shared its MAPay Platform and related Confidential Information with him as its Chief Global Strategy Officer and pursuant to the NDA as an officer of Armour. (**Exhibit H, p. 2-3.**)

69.     Further, Dershem stated that Metz and the other Defendants only knew of a proposed trial of the MAPay Platform with a pharmaceutical corporation because Metz was given access to MAPay's confidential business strategies and potential customer lists in MAPay's password-protected systems. (*Id*).

70.     Dershem ended his August 17, 2023 email as follows:

We were shocked by your news of the filing of your patent application. It was a below-the-belt punch. For some reason, we held out some hope that this could be rectified through discussion about the substance of it all. We held out on hope that perhaps you would be motivated about leading the charge at MAPay Pharma, with the opportunity for a reward tied to success beyond the cash/equity grants in your Consulting Agreement. We hoped that trust could be regained. Then we read your MAPay specific LinkedIn post, which was both reckless and potentially subjects the Company to potential legal actions from potential public interests and/or competitive actors. As we piece together the timeline and substance of your edits to the Consulting Agreement and this patent application. Sadly, what we have learned is that this seems to have been a calculated move by you orchestrated over some number of weeks or months.

It is time for us to move on. I remind you of your continuing obligations of confidentiality to our employees, other personnel, customers, prospects, vendors and investors.

(**Exhibit H, p. 3.**)

71.     On August 18, 2023, Metz responded by sending screenshots from his computer confirming that he never planned to sign the proposed consulting agreement, and that he misappropriated the MAPay Platform and planned to steal its largest pharmaceutical customer.

72.     The screenshots revealed that Metz had created and delivered a PowerPoint presentation directly to MAPay's largest pharmaceutical customers. MAPay was in the process of negotiating a trial of its MAPay Platform with this customer and had been negotiating this trial for over two years.

73.     The PowerPoint Metz created (**Exhibit I**)[2] used his name and included, without MAPay's authorization, MAPay's Confidential Information directly related to the MAPay Platform including the proprietary blockchain technology and formulas that form the basis of the MAPay Platform and graphics and other images taken directly from MAPay's materials.



*Screen Capture of Metz's Value Based Pricing Presentation*

---

[2] Due to the confidential nature of the information contained in the PowerPoint presentation Metz created, Plaintiff has included in Exhibit I only the first slide from that presentation.

(**Exhibit I**.)

74.     Given Metz's instruction to the other Defendants that "plagiarism is cool," MAPay believes all Defendants were aware of and conspired with Metz with respect to the copying of the MAPay Platform, related technologies, marketing materials, business strategies shared with them in confidence as MAPay consultants, and other Confidential Information disclosed pursuant to and subject to the protections provided in the NDAs.

75.     After these email exchanges in August 2023, Metz began posting on LinkedIn to advertise that he was in the business of "Value Based Pricing," using language he learned from MAPay. He promoted himself as a "Biotechnology/Pharmaceutical/digital blockchain and AI Executive," and suggested that he had a patent-protected solution. Attached hereto at **Group Exhibit J** are copies of Metz's LinkedIn profile and the referenced LinkedIn posts.

76.     Prior to his involvement with MAPay and signing the NDA, Metz had no knowledge of blockchain technology or value-based pricing.

77.     MAPay still does not know the full extent to which Defendants have unlawfully misappropriated and disclosed the MAPay Platform, unlawfully solicited MAPay's customers, and misappropriated and misused MAPay's Confidential Information including its business strategies, marketing materials, and related distribution and sales methods.

78.     MAPay has been substantially harmed by Metz's and the other Defendants' coordinated and unauthorized misappropriation, misuse, and disclosure of the MAPay Platform and MAPay's Confidential Information.

G.     **Metz Threatens MAPay**

79.     Following the disclosure of his conduct, including the misappropriation of MAPay's Confidential Information, Metz also attempted to intimidate and threaten MAPay,

Dershem, and others at MAPay with what he described as a "very specific awareness campaign" of threats and disparaging statements implicating the reputation of MAPay and its officers in an effort to deter or forestall any attempt by MAPay to seek damages against Metz.

80.     In a text message to Parker on October 2, 2023, Metz threatened "a very specific awareness campaign beginning tomorrow which will not be flattering if we don't make material progress in 15 hours. You are on notice."



***Metz's Text Message, October 2, 2023***

**H.      MAPay Files Suit in the District of New Jersey and Metz Responds with False Statements**

81.     On October 31, 2023, MAPay filed a complaint for breach of contract and trade secret misappropriation against Defendants in the United States District Court for the District of New Jersey. *See MAPay, LLC v. Metz, et al.*, No. 23-cv-21678 (D.N.J.).[3]

_____

[3] MAPay voluntarily dismissed its complaint in the District of New Jersey, without prejudice, pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure on June 7, 2024. *MAPay, LLC v. Metz, et al.*, No. 23-cv-21678, Dkt. No. 37 (D.N.J.).

82.    In response, on December 14, 2023, Metz and the other Individual Defendants filed a complaint in the Circuit Court of Cook County, Illinois against MAPay, its affiliate MPayz Limited, Dershem, and Parker in which they alleged fraud in the inducement, conspiracy, and violation of Illinois' securities laws. *See Metz, et al. v. MAPay, LLC, et al.*, No. 2023CH010036 (Cir. Ct. Ck. Cty.).[4]

83.    Following the filing of the Individual Defendants' lawsuit in Illinois, Metz continued to make numerous posts on his LinkedIn page and other social media websites about MAPay and its officers, including Dershem and Parker, intending to publicly harass and disparage the reputation of MAPay and its officers in their individual and personal capacities, and to interfere in MAPay's business.

84.    Metz has continued to post and repost allegations against MAPay, Dershem, and Parker, including on Dershem's college social media pages and the pages of other businesses and investors associated with MAPay, Dershem, and Parker. These allegations include untrue statements and accusations of criminal activity.

85.    Metz's statements included social media posts which implied untrue accusations of criminal activity and investigation by the United States Department of Justice through the use of glaring and misleading language, such as "#LIAR," "#FRAUD," "#FRAUDULENT," "#CONSPIRACY," "ILLEGAL," "#JAIL," "#JAILTIME," "#FBI," and "#DOJ."

---

[4] The Individual Defendants' state court action is still pending.



Robert Metz
General Manager, Armour Life Sciences
2h · Edited · 🌐

I worked with MAPay, LLC in 2023 with Michael
Dershem "Dersh" (CEO), and John Parker (GC and
Chief Managing Officer).

Anyone seeking to work with, or for MAPay should
read through this complaint.

In my 55 spins around the sun, working with all sorts
of people and companys I've never seen anything like
this. Hopefully you can learn something here about
people and business practices. It's simply astounding
this happens in today's world.

More to come soon.

#michaeldershem #johnparker#AMAZON
#AMAZONWEBSERVICES #WEB3 #FINTECH
#DERSH #BERMUDA #BHC #AFRICA
#BERMUDAHEALTHCOUNCIL #BERMUDAPREMIER
#IBM #BLOCKCHAIN #UTILITYCOIN #CRYPTO
#FRAUD #FRAUDULENT #DISEPTION
#CIVILACTION #CONSPIRACY #POS #LIAR
#POORJUDGEMENT #ILLEGAL #PONZY
#PONZYSCHEME #JAIL #JAILTIME #FBI #DOJ
#REGULATORY #CRYPTOREGULATION
#CRYPTOEXCHANGE #EXCHANGE #NASDAQ
#DOWJONES #INVESTMENT#Merck #sanofi
#novonordisk #pfizer #Amgen #roche #novartis
#takeda #bermuda #INDIA #PhRMA #BIO #BMS
#gileadsciences #gilead #vertex #CSL #biogen
#glaxosmithkline#seagen #valuebasedpricing
#CMS #finra #ftc #fda #fintech #cfpb #doddfrank

***Metz's LinkedIn Post, Nov-Dec 2023***

86.    Metz made additional social media posts and communications of a similar nature,
intending to harass and defame MAPay and its officers. True and correct screenshot images of
these posts are attached hereto as **Group Exhibit K**.

87.    These statements made by Metz are false, harassing, and have harmed MAPay's
reputation and business relationships within the healthcare industry and beyond.

88.    On December 26, 2023, while Metz continued to pursue his campaign of
harassment, counsel for MAPay sent a cease and desist letter to Metz's attorney specifically

identifying Metz's deliberate and intentional conduct and demanding that it end. A copy of that letter is attached as **Exhibit L.**

89.     Following the letter to Metz's counsel on December 26, 2023, Metz intentionally and deliberately continued his "awareness campaign" with the intent of harassing, disparaging, and harming MAPay and its officers, including posts on social media pages personally and professionally associated with MAPay or its officers.

90.     As recently as May 2024, Metz was continuing to make disparaging and harmful posts online about MAPay and its officers, including on, for example, the social media pages of other businesses associated with Parker.

91.     In conjunction with Metz's social media posts and marketing efforts for Armour's Value Based Pricing services and blockchain technology, the express intent of these posts is to damage the reputations, customer relationships, and profitability of MAPay and its officers. These posts seek to drive customers and potential customers away from MAPay, convince them that Metz has developed his own version of the MAPay Platform, and gain their business.

92.     In pursuing his "awareness campaign," Metz has also directly communicated with a number of MAPay's professional contacts, including investors, consultants, current and former employees, contractors and vendors, and even interns of MAPay, spreading false and disparaging information about MAPay and advertising Metz's own pilfered version of the MAPay Platform.

93.     These contacts include key team members of MAPay located in the United States and MAPay's foreign business contacts in India and Africa.

94.     Like his social media posts, the intent of these communications is to interfere with MAPay's current business structure, drive away customers and potential customers, convince those

individuals and organizations that Metz has developed his own version of the MAPay Platform, and gain their business.

95.     The evidence thus far indicates that Defendants intentionally engaged in coordinated efforts to violate their NDAs and consulting arrangements and to misappropriate for their own use the MAPay Platform and MAPay's Confidential Information.

## COUNT I – BREACH OF CONTRACT
**Against Armour Ops LLC, BRANDominance, Inc.,
Natalie Allman Inc., and Michael Sullivan**

96.     Plaintiff re-alleges and incorporates by this reference Paragraphs 1-95 as if fully set forth herein.

97.     The NDAs signed by Defendants Armour Ops, LLC d/b/a Armour Life Sciences, LLC, BRANDominance Inc., Natalie Allman Inc., and Michael Sullivan are valid and enforceable agreements that obligate these Defendants to refrain from using or disclosing MAPay's Confidential Information, which includes the MAPay Platform and its underlying blockchain technology, formulas, pricing models, and other inventions, along with MAPay's business strategies, marketing materials, customer lists, and distribution and sales methods.

98.     MAPay fully performed its obligations under the NDAs.

99.     Defendants breached their obligations under the NDAs by disclosing and using Confidential Information covered by the NDAs in the preparation of a Provisional Patent filing, the development of competing technology that was virtually identical to the MAPay Platform, and the solicitation of MAPay's customers.

100.    As a result of these breaches, MAPay has suffered and continues to suffer injury, damages, and irreparable harm.

WHEREFORE, Plaintiff MAPay respectfully requests that the Court enter judgment on this Count in its favor and against the Defendants and award the statutory, equitable, and legal remedies sought in the Prayer for Relief in this Complaint, and any other relief the Court deems equitable and just.

### COUNT II – MISAPPROPRIATION OF TRADE SECRETS
**Against All Defendants**
**(Federal Defend Trade Secrets Act of 2016)**

101.    Plaintiff re-alleges and incorporates by this reference Paragraphs 1-95 as if fully set forth herein.

102.    The MAPay Platform and the underlying blockchain technology, formulas, and pricing models that constitute the Platform, along with MAPay's customer lists and business strategies related to deploying the Platform, are confidential trade secrets developed and owned exclusively by MAPay.

103.    MAPay's trade secrets are used in both foreign and interstate commerce, as MAPay has marketed and sold its trade secrets to customers located throughout the U.S. and around the world.

104.    MAPay preserves the confidentiality of its trade secrets by requiring recipients of its trade secrets and related Confidential Information to sign nondisclosure agreements and by maintaining the trade secrets and related Confidential Information on a password-protected information system.

105.    MAPay derives economic value in maintaining the confidentiality of its trade secrets as its unique MAPay Platform positions MAPay at the forefront of emerging technologies within the healthcare industry.

106.    Defendants gained access to MAPay's trade secrets through confidential relationships established through consulting and other work performed for and on behalf of MAPay.

107.    In breach of this confidence and without authorization from MAPay, Defendants disclosed MAPay's trade secrets and related Confidential Information to others and used it for their own pecuniary gain.

108.    Defendants have used and continue to use MAPay's Confidential Information and trade secrets to the detriment of MAPay in violation of the federal Defend Trade Secrets Act of 2016.

109.    Defendants have misappropriated MAPay's trade secrets and related Confidential Information and, unless restrained, will continue to misappropriate and misuse MAPay's trade secrets and related Confidential Information.

110.    Defendants misappropriated MAPay's trade secret information willfully and maliciously, without justification or authorization, entitling MAPay to recover attorneys' fees from Defendants pursuant to 18 U.S.C. § 1836(b)(3)(D) and punitive or exemplary damages from Defendants pursuant to 18 U.S.C. § 1836(b)(3)(C).

111.    As a result of this misappropriation, MAPay has suffered and will continue to suffer injury, damages, and irreparable harm.

WHEREFORE, Plaintiff MAPay respectfully requests that the Court enter judgment on this Count in its favor and against the Defendants and award the statutory, equitable, and legal remedies sought in the Prayer for Relief in this Complaint, and any other relief the Court deems equitable and just.

## COUNT III – MISAPPROPRIATION OF TRADE SECRETS
### Against All Defendants
### (Illinois common law)

112.    Plaintiff re-alleges and incorporates by this reference Paragraphs 1-95 as if fully set forth herein.

113.    The MAPay Platform and the underlying blockchain technology, formulas, and pricing models that constitute the Platform, along with MAPay's customer lists and business strategies related to deploying the MAPay Platform, are confidential trade secrets developed and owned exclusively by MAPay.

114.    MAPay preserves the confidentiality of its trade secrets by requiring recipients of its trade secrets and Confidential Information to sign nondisclosure agreements and by maintaining the trade secrets and related Confidential Information on a password-protected information system.

115.    MAPay derives economic value in maintaining the confidentiality of its trade secrets as its unique MAPay Platform positions MAPay at the forefront of emerging technologies within the healthcare industry.

116.    Defendants gained accessed to MAPay's trade secrets through confidential relationships established through consulting and other work performed for and on behalf of MAPay.

117.    In breach of this confidence and without authorization from MAPay, Defendants disclosed MAPay's trade secrets and Confidential information to others and used it for their own pecuniary gain.

118.    Defendants have used and continue to use MAPay's Confidential Information and trade secrets to the detriment of MAPay.

119.     Defendants have misappropriated MAPay's trade secrets and related Confidential Information and will continue to misappropriate and misuse MAPay's trade secrets and Confidential Information.

120.     Defendants misappropriated MAPay's trade secret information willfully and maliciously, without justification or authorization from MAPay.

121.     As a result of this misappropriation, MAPay has suffered and will continue to suffer injury, damages, and irreparable harm.

WHEREFORE, Plaintiff MAPay respectfully requests that the Court enter judgment on this Count in its favor and against the Defendants and award the statutory, equitable, and legal remedies sought in the Prayer for Relief in this Complaint, and any other relief the Court deems equitable and just.

### COUNT IV – CONSPIRACY TO MISAPPROPRIATE TRADE SECRETS
**Against Robert Metz, Kathryn Mertes-Egeland,**
**Natalie Allman Dumstorff, and Michael Sullivan**

122.     Plaintiff re-alleges and incorporates by this reference Paragraphs 1-95 as if fully set forth herein.

123.     Defendants Metz, Mertes-Egeland, Allman Dumstorff, and Sullivan knowingly agreed to and did participate in the theft, misappropriation, misuse, and publication or disclosure of MAPay's trade secrets and Confidential Information under the direction of Defendant Metz and for the purpose of benefiting themselves.

124.     Defendants engaged in a concerted effort to steal, misappropriate, and misuse MAPay's trade secrets and Confidential Information.

125.     Defendants did steal, misappropriate, misuse, disclose, and publish MAPay's trade secrets and Confidential Information in the preparation of a Provisional Patent filing, the

development of competing technology virtually identical to the MAPay Platform, and the solicitation of MAPay's customers.

126.     As a result of this misappropriation, MAPay has suffered and will continue to suffer injury, damages, and irreparable harm.

WHEREFORE, Plaintiff MAPay respectfully requests that the Court enter judgment on this Count in its favor and against the Defendants and award the statutory, equitable, and legal remedies sought in the Prayer for Relief in this Complaint, and any other relief the Court deems equitable and just.

## COUNT V – FALSE ASSOCIATION
**Against Robert Metz and Armour Ops, LLC d/b/a Armour Life Sciences, LLC**
**(15 U.S.C. § 1125(a), "Lanham Act")**

127.     Plaintiff re-alleges and incorporates by this reference Paragraphs 1-95 as if fully set forth herein.

128.     Defendant Metz made false and misleading public statements on social media and to MAPay's customers on behalf of himself and Defendant Armour Ops, LLC, falsely claiming that he developed and owns the value-based pricing services and blockchain technologies offered by Defendant Armour Ops, LLC.

129.     The value-based pricing services and blockchain technology offered by Defendants Metz and Armour Ops, LLC replicate the MAPay Platform without authorization or affiliation, which was developed and owned by MAPay and its founding members.

130.     Defendant Metz has advertised, and continues to advertise, the value-based pricing services and blockchain technology of Armour Ops, LLC on social media and has made presentations directly to MAPay's customers located in New York and elsewhere containing false and misleading statements as to the origin of the technology.

131.     Defendants Metz and Armour Ops, LLC's conduct has caused confusion and mistake in the marketplace and elsewhere as to the origin and approval of the blockchain technology and the value-based pricing services.

132.     MAPay has been and will continue to be harmed by Defendants Metz and Armour Ops, LLC's posts and marketing efforts which falsely claim ownership of the value-based pricing platform that MAPay developed, owns, and has the exclusive right to sell and promote.

WHEREFORE, Plaintiff MAPay respectfully requests that the Court enter judgment on this Count in its favor and against the Defendants and award the statutory, equitable, and legal remedies sought in the Prayer for Relief in this Complaint, and any other relief the Court deems equitable and just.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff MAPay, being without adequate remedy at law, and being threatened with continuing irreparable injury, respectfully requests the following relief:

a)     That the Court enter judgment in favor of MAPay and against Defendants on all claims for relief made against Defendants in this action;

b)     That the Court award MAPay compensatory, consequential, and punitive damages in an amount to be determined at trial as a result of the actions of Defendants;

c)     That the Court award MAPay all statutory remedies, injunctive relief, and damages permitted under the Defend Trade Secrets Act 18 U.S.C. § 1836(b), including punitive and exemplary damages and attorneys' fees;

d)     That the Court enter a permanent injunction, pursuant to 15 U.S.C. § 1116(a), enjoining Defendants Metz and Armour Ops, LLC from using, offering, or advertising the value-based pricing services and blockchain technologies which are the intellectual property developed

and owned exclusively by MAPay, and prohibiting Defendants Metz and Armour Ops, LLC from making any written or oral statements that indicate or imply ownership of these value-based pricing services and blockchain technologies.

  e) That the Court order an accounting and disgorgement of any profits earned by the Defendants as a result of Defendants' unlawful activities;

  f) That the Court grant MAPay immediate discovery and order the Defendants to immediately appear for their depositions and produce all documents, including but not limited to electronically stored information and data, containing information obtained by the Defendants from or about MAPay, including but not limited to Plaintiff's company data, trade secrets, and confidential and/or proprietary information and customer information as well as the same for Metz's Provisional Patent;

  g) That the Court order and mandate that Defendants protect and safeguard MAPay's company data, trade secrets and confidential and/or proprietary information, including but not limited to any electronically stored information and data, property, materials, documents, records, and information relating to the customers, prospective customers, business relationships or activities of MAPay and the MAPay Platform;

  h) That the Court order Defendant Metz to immediately delete or remove any posts, statements, or content from any of his social media accounts relating to MAPay or any of its officers, and that Metz cease from publishing any such posts, statements, or content in the future;

  i) That the Court award MAPay its reasonable attorneys' fees, costs and expenses of this litigation as provided by law;

  j) That all costs and lawful interest, both pre-judgment and post-judgment, be assessed against Defendants to the greatest extent allowable by law; and

k)    That the Court award such other and further relief as this Court may deem equitable,

just, and proper.


Dated: September 18, 2024                          Respectfully Submitted,

                                                  MAPAY, LLC


                                                  By:   /s/ Anthony D. Pesce

                                                  Anthony D. Pesce
                                                  PEDERSEN & HOUPT
                                                  161 North Clark Street, Suite 2700
                                                  Chicago, Illinois 60601
                                                  Phone: (312) 261-6888
                                                  apesce@pedersenhoupt.com

                                                  *Attorney for Plaintiff MAPay, LLC*